IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **DOUGLAS BEACH** | ) | |
| 108 Sunshine Drive | ) | |
| Stafford, Virginia 22556 | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **PAMELA BEACH,** | ) | |
| 108 Sunshine Drive | ) | |
| Stafford, Virginia 22556 | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | Civil No. _____ |
| | ) | |
| **MEDTRONIC, INC.** | ) | |
| 710 Medtronic Parkway | ) | |
| Minneapolis, Minnesota 55432 | ) | **COMPLAINT AND** |
| | ) | **JURY DEMAND** |
|   **Serve:** | ) | |
|   **CT Corporation System** | ) | |
|   **Registered Agent** | ) | |
|   **1015 15th Street, N.W.** | ) | |
|   **Suite 1000** | ) | |
|   **Washington, D.C.20005** | ) | |
| | ) | |
|   **and** | ) | |
| | ) | |
| **MEDTRONIC PUERTO RICO, INC.** | ) | |
| Road 149 | ) | |
| km 56.3 | ) | |
| Box 6001 | ) | |
| Villalba, Puerto Rico | ) | |
| | ) | |
|   **Serve:** | ) | |
|   **CT Corporation System** | ) | |
|   **Registered Agent** | ) | |
|   **1015 15th Street, N.W.** | ) | |
|   **Suite 1000** | ) | |
|   **Washington, D.C.20005** | ) | |
| | ) | |

|  |  |
|---|---|
| **and** | ) |
|  | ) |
| **MEDTRONIC PUERTO RICO** | ) |
| **OPERATIONS CO.,** | ) |
| Road 149 | ) |
| km 56.3 | ) |
| Box 6001 | ) |
| Villalba, Puerto Rico | ) |
|  | ) |
| <u>**Serve:**</u> | ) |
| **CT Corporation System** | ) |
| **Registered Agent** | ) |
| **1015 15th Street, N.W.** | ) |
| **Suite 1000** | ) |
| **Washington, D.C.20005** | ) |
|  | ) |
| **Defendants.** | ) |
|  | ) |

## COMPLAINT AND JURY DEMAND

NOW COME the Plaintiffs, Douglas Beach and Pamela Beach, by and through their attorneys, Janet, Jenner & Suggs, LLC, and for their causes of action, sue the Defendants Medtronic, Inc.; Medtronic Puerto Rico, Inc.; and Medtronic Puerto Rico Operations Co., and state and allege as follows:

## PREAMBLE

1.    Medtronic designs, manufactures, and sells medical devices that treat cardiac arrhythmias, heart failure, and coronary and peripheral vascular disease.  An arrhythmia is an irregular cardiac rhythm that can cause significantly decreased cardiac output and ultimately, death.  Medtronic holds itself out as "the global leader in medical technology, alleviating pain, restoring health and extending life for millions of people around the world."  *See* 2005 Annual Statement, Medtronic, Inc.

2.    A number of devices designed to detect and treat abnormally fast and irregular heart rhythms and to provide pacing for improper heart rhythms are available from Medtronic and other manufacturers, including implantable cardiac defibrillators ("ICDs"). ICDs contain pacemakers as well as defibrillators; while a pacemaker is used primarily to correct slow heart rates, an ICD detects and corrects both fast and slow heart rates. The pacemaker portion corrects the slow rates and the anti-tachycardia portion can "over-drive pace" rapid rates. The defibrillator portion can shock ventricular tachycardia and ventricular fibrillation to stop the heart and allow an appropriate rhythm to take over.

3.    ICDs are designed to be implanted primarily under the skin of the chest wall. The device's power source, or pulse generator, is implanted in a pouch formed in the chest wall generally over the left pectoralis major muscle.

4.    Typically, wires called leads are inserted through a major vein and attached directly to the muscle on the inside of the heart. Electrodes that sense the heart's rhythm are built into the lead wires and positioned in the heart, where they monitor the heartbeat and can administer an electric shock to abort a dangerous "over-drive pace," a very rapid rhythm, or pace the heart at a normal rhythm if an irregularity is detected.

5.    Such devices are used in patients, like the Plaintiff, who have arrhythmias or irregular heartbeats that are considered life-threatening. People with these medical problems are at risk for ventricular fibrillation (rapid, ineffective contraction of the ventricles of the heart), or ventricular tachycardia (excessively rapid heartbeat) that is poorly controlled by medication. These arrhythmias or irregular heart beats can result in the loss of consciousness or death, unless

the patient receives therapy from an appropriate device to put the heart back into an appropriate cardiac rhythm.

6.     If an implanted ICD and lead operate properly, the system can save a patient's life.  If either fails to operate, the patient may die within minutes.

## THE PARTIES

7.     Plaintiffs, Douglas Beach and Pamela Beach, are United States citizens, residing at 108 Sunshine Drive, Stafford, Virginia.

8.     At all relevant times, Plaintiffs Douglas Beach and Pamela Beach have been and continue to be husband and wife.

9.     Defendant Medtronic, Inc. is a Minnesota corporation, with its principal place of business at 710 Medtronic Parkway, Minneapolis, Minnesota 55432.  Medtronic develops technology to treat conditions such as heart disease and other illnesses.  Medtronic manufactures medical devices and sells them worldwide.  Medtronic's Cardiac Rhythm Disease Management Division ("CRM Division") is the division that develops, researches, advertises, promotes, markets and sells all of Medtronic implantable defibrillators ("ICDs"), and leads, some of which are marketed under the trade name "Sprint Fidelis."  CRM Division's operations are principally conducted out of its facilities at Cardiac Rhythm Disease Management at 7000 Central Ave., Minneapolis, Minnesota 55432.

10.     Defendant Medtronic Puerto Rico, Inc. is a corporation existing by virtue of the laws of the Territory of Puerto Rico, with its principal place of business at Road 149, km 56.3, Box 6001 Villalba, Puerto Rico.

11.     Defendant Medtronic Puerto Rico Operations Co., Inc. is a corporation existing by virtue of the laws of the Territory of Puerto Rico, with its principal place of business at Road 149, km 56.3, Box 6001 Villalba, Puerto Rico.

12.     Medtronic Puerto Rico, Inc. and Medtronic Puerto Rico Operations Co., Inc. are the wholly owned subsidiaries of Medtronic, Inc. and formulate, develop, manufacture and sterilize the devices at issue in this lawsuit.

13.     Medtronic, Inc., Medtronic Puerto Rico, Inc. and Medtronic Puerto Rico Operations Co., Inc. (hereafter referred to collectively as "Medtronic") at all times relevant hereto were engaged in the business of testing, developing, manufacturing, distributing, licensing, labeling and marketing, either directly or indirectly through third parties or related entities, cardiac devices in the District of Columbia.

## JURISDICTION AND VENUE

14.     The court has personal jurisdiction over this matter pursuant to 28 U.S.C. §1332(1) in that the Plaintiff is a resident of the Commonwealth of Virginia and the Defendants are foreign corporations with principal places of business outside of the Commonwealth of Virginia.

15.     The amount in controversy in this matter exceeds $75,000.00, exclusive of interest and costs.

16.     Venue is proper in this jurisdiction pursuant to 28 U.S.C § 1391(a)(2). Medtronic regularly solicits and engages in business and other persistent courses of conduct and derives substantial revenues from goods used and consumed in the District of Columbia and/or for services rendered in the District of Columbia.

17.     Medtronic expected or reasonably should have expected that its tortious acts would have consequences in the District of Columbia.

18.     Medtronic derives substantial revenue in the District of Columbia from interstate commerce.

19.     Medtronic committed a tortious act within the District of Columbia by marketing, distributing, retailing and selling dangerous and defective medical devices, namely Sprint Fidelis leads, to Plaintiff Douglas Beach and did cause serious and permanent injury to him.  The subject Sprint Fidelis lead was implanted into Plaintiff Douglas Beach at the Washington Hospital Center in Washington, D.C.

20.     Defendants are amenable to jurisdiction and service of process in the District of Columbia in that Defendants are doing business in the District of Columbia, have committed a tort in whole or in part in the District of Columbia, and/or have continuing minimum contacts with the District of Columbia.

## FACTUAL BACKGROUND

21.     Douglas Beach was born on October 20, 1943.  Pamela Beach was born on May 14, 1946.

22.     On January 13, 2006, at the Washington Hospital Center, 110 Irving St. N.W., Washington, D.C., Mr. Beach's physician implanted a Medtronic cardiac device into him.  The device had two leads with the following Serial and Model Numbers:

| Serial Number | Model Number |
|---------------|--------------|
| PNT403394H    | D154VRCID    |
| LFJ119415V    | 694958ID     |

6

23.     On or about October, 2007, Mr. Beach learned from news reports and then from a letter from Medtronic and his physician that the Sprint Fidelis leads implanted in his body had an irregularity that could result in its failure to function. Mr. Beach has been in consultation with his physicians for the purpose of determining the present condition of the Sprint Fidelis leads and whether the risk to his life from explantation surgery is greater or less than the risk to his life of leaving the Sprint Fidelis leads in place. Mr. Beach is suffering emotional distress as a result of the knowledge of the defective nature of his Sprint Fidelis leads, and knowledge that he may, at any time, be seriously, if not fatally, injured because of its malfunction.

24.     This action seeks recovery for Plaintiff who has been implanted with Sprint Fidelis lead marketed by Medtronic under the model number 6949581D.

25.     At all times relevant, this Sprint Fidelis lead was researched, developed, manufactured, marketed, promoted, advertised, sold, and distributed by Medtronic to be used in connection with ICDs.

26.     The majority of ICDs now use two or three leads. As a result, smaller high-voltage leads are attractive to electrophysiologists because they are believed to be easier to insert, and are less likely to obstruct blood flow or distort the tricuspid valve. The Medtronic Sprint Fidelis leads are smaller high voltage leads.

27.     In 2001, Medtronic marketed its then-smallest defibrillation lead called the Sprint Quattro Secure, model 6947 ("Quattro leads").

28.     In 2004, Medtronic introduced and marketed the Sprint Fidelis to replace the Sprint Quattro as the high voltage lead of choice and to attempt to gain a larger market share.

29.     At the time that Medtronic announced the marketing of the Sprint Fidelis leads, Medtronic claimed that "[t]he small size of the Sprint Fidelis (Fidelis is a Latin word that means 'faithful') helps improve passage into a patient's venous system for an easier implant, and minimizes venous obstruction." Medtronic also referred to the leads as "state-of-the-art." *See* Medtronic News Release (Sept. 2, 2004), available at http://wwwp.medtronic.com/Newsroom/NewsReleaseDetails.do?itemId=1095281834568&lang=en_US.

30.     Medtronic further represented that the Sprint Fidelis leads were based on the "proven" design of the Quattro leads.

31.     The Sprint Fidelis leads were approved for sale by the United States Food and Drug Administration (the "FDA") in September 2004 and have been implanted in over 160,000 patients worldwide.

32.     The Sprint Fidelis lead is a 6.6 French isodiametric multifilar true bipolar high voltage lead with silicone insulation and polyurethane outer coating.

33.     The Models 6949 and 6948 have two high voltage coils; the 6930 and 6931 models have a single right ventricular high voltage coil.  As of January 2007, approximately 144,311 model 6949 Sprint Fidelis leads, 7510 model 6948 leads, 5387 model 6931 leads, and 236 model 6930 leads had been implanted.

## THE DEFECTS IN THE SPRINT FIDELIS LEADS

34.     Since the Sprint Fidelis leads were introduced to the market, it has become evident that a significant portion of the leads have potentially fatal defects.

35.    Such defects were discussed in an article written by doctors at The Minneapolis Heart Institute, one of the premiere heart institutes in the world, based on a study of the incidence of lead failures in the Sprint Fidelis models compared to the Sprint Quattro models. According to the report, which was prepared by Dr. Robert G. Hauser, *et al.*, and published in the Heart Rhythm Society Journal in the Spring of 2007, "Early Failure of Small-Diameter High-Voltage Inflammable Cardioverter-Defibrillator Lead," Heart Rhythm Society 2007.03.041 (2007) ("Early Failure"), the Minneapolis Heart Institute's experience reflected that, between September 2004 and February 2007, 583 patients were implanted with Sprint Fidelis Model 6949 leads, and nine patients received other Sprint Fidelis models.  During that time, six patients experienced Sprint Fidelis Model 6949 lead failures.  The failed Sprint Fidelis Model 6949 leads had been implanted by various electrophysiologists, cardiologists and thoracic surgeons.  The average time to failure was fourteen months (based on a range of four to twenty-three months). *Early Failure*, p. 893.

36.    The study compared the actuarial survival of the 583 Sprint Fidelis Model 6949 leads implanted at the Minneapolis Heart Institute to the survival of 285 Sprint Quattro Model 6947 leads implanted at the Institute between November 2001 and March 2007.  The difference in survival between the Sprint Fidelis Model 6949 lead and the Sprint Quattro Secure Model 6947 lead was extremely significant.  The failure rate for the Sprint Fidelis Model 6949 lead was 1-2% during the first two years of implant and was ten times greater than the failure rate for the Sprint Quattro Secure Model 6947 lead. *Early Failure*, p. 893-894.

37.    The significant number of lead failures involved lead fractures of the PACE-sense conductor or coil in the Sprint Fidelis Model 6949.  The fracture rate for the Sprint Fidelis leads

9

was three times higher than the fracture rate of the Quattro Model 6947. *Early Failure*, p. 894-895.

38.    Another study, conducted at Cornell University Medical Center by Sunil Mirchandani, *et al.*, found "(a) 17% incidence of abnormal right ventricular sensing during follow-up of patients implanted with the Medtronic Sprint Fidelis ICD lead," necessitating "an early revision of the system in 4% of patients." *See* Abstract of *Defibrillator Leads: Is Smaller Necessarily Better,?* 2006, available at http://vivo.library.cornell.edu/entity?home=&id=30168.

39.    Medtronic has not disclosed the precise mechanism of the Sprint Fidelis lead fracture failures. However, it appears that the defect in the Sprint Fidelis may be attributable to the small diameter of the coil and conductors and the fact that, in light of this small diameter, it is subject to stress damage both during and after implant. Fracture eventually occurs when the conductor is critically overstressed. The number of fractures that have been observed in these leads indicates that there is a clear defect in the leads themselves.

40.    A review of the FDA's MAUDE database, which contains reports of adverse events associated with the use of medical devices, discloses that, as of July 2007, over 1000 Medical Device Reports ("MDR"s) regarding Sprint Fidelis lead had been filed since September 2004. The most frequent complaints were fracture and inappropriate shocks, and the most common observations were high impedance, oversensing and noise, and failure to capture or high threshold.

41.    Medtronic analyzed approximately 125 of those leads that were returned to Medtronic before July 2006. According to the relevant MDR reports, Medtronic concluded that 77 out of 125 leads (or 62%) were defective. The predominant manifestation of the defect was

conductor fracture, involving the PACE-sense conductor and coil or the high voltage (defibrillation) conductor.    PACE-sense conductor or coil fracture was manifested by inappropriate shocks or oversensing/noise and high impedance, while high voltage conductor fracture was primarily linked to high impedance.

42.    Medtronic filed more than 350 additional MDRs regarding the Sprint Fidelis leads between August 2006 and February 2007.  Medtronic did not include similar analysis of those leads in the MDRs filed by Medtronic during this period.

43.    On March 21, 2007, Medtronic issued a physician advisory, in the nature of a "Dear Doctor Letter," that advised physicians of "the higher than expected conductor fracture rates in … Sprint Fidelis leads."  Medtronic claims in that letter to be investigating reports of lead failures, however, still represents that the Sprint Fidelis leads are performing consistent with, and "in line with other Medtronic leads ….  And consistent with lead performance publicly reported by other manufacturers."  This letter also states, "…variables within the implant procedure may contribute significantly to these fractures…  For conductor fractures that occur around the suture sleeve, our preliminary investigation suggests that under certain implant techniques, the lead appears to be exposed to severe bending or kinking in the pectoral area."  At no time prior to this letter did Medtronic warn physicians that its leads must be specially handled during the implantation procedure or that they could "severely bend" or "kink" if they are implanted using certain accepted implant techniques.

44.    On October 15, 2007, Medtronic recalled all unimplanted Sprint Fidelis leads, citing several deaths related to the leads.  Medtronic recommended that implanted Sprint Fidelis leads be monitored.

11

45.     Medtronic's representation of the consistency of the performance of the Sprint Fidelis leads is untrue in light of the reported experience with the leads and the various issues included in the MAUDE database reports.

46.     At all times relevant, Medtronic misrepresented the safety of the Sprint Fidelis leads and negligently manufactured, marketed, advertised, promoted, sold, and distributed the leads as safe devices to be used together with ICDs for prophylactic treatment of patients with prior myocardial infarction and decreased ejection fraction, ventricular arrhythmias, and patients who are at high risk for developing such arrhythmias.  Some patients are dependent on such devices to maintain an appropriate heart rhythm, and therefore, adequate cardiac output.  For these patients, failure of the leads connected to the ICD can cause sudden faintness, or loss of consciousness, and can result in death.

47.     At all times relevant, Medtronic failed to warn that the Sprint Fidelis leads were prone to breakage or that particular processes should be implemented in order to avoid breaking the Sprint Fidelis leads.

48.     As a result of their defective design and manufacture, Medtronic's Sprint Fidelis leads suffer fracture, leading to malfunction in the transmission of the electric signal from the ICD to the patient's heart.

49.     At all times relevant, the Sprint Fidelis (collectively the "leads") were researched, developed, manufactured, marketed, promoted, advertised and sold by Medtronic.

50.     At all times relevant, Medtronic misrepresented the safety of the Sprint Fidelis leads, and negligently manufactured, marketed, advertised, promoted, sold and distributed the leads as safe and effective devices to be used for implantation with ICDs for prophylactic

12

treatment of patients with prior myocardial infarction and a limited ejection fraction, patients who have had spontaneous and/or inducible life-threatening ventricular arrhythmias, and patients who are at high risk for developing such arrhythmias.

51.     At all times relevant to this action, Medtronic knew, and had reason to know, that the Sprint Fidelis leads were not safe for the patients for whom they were prescribed and implanted, because the leads fractured and otherwise malfunctioned, and therefore failed to operate in a safe and continuous manner, causing serious medical problems and, in some patients, catastrophic injuries and deaths.

52.     At all times relevant to this action, Medtronic knew, and had reason to know, that its representations that the Sprint Fidelis leads were easier to implant and based on "proven" technology were materially false and misleading.

53.     Approximately 129,000 of the affected devices remain in service in the United States and in other countries.

54.     As a result of this defective design and manufacture, the Sprint Fidelis leads can cause serious physical trauma and/or death.  Medtronic knew and had reason to know of this tendency and the resulting risk of injuries and deaths, but concealed this information and did not warn Plaintiff or her physicians, preventing Plaintiff, and the medical community from making informed choices about the selection of leads for implantation.

55.     Medtronic designed, manufactured, marketed, promoted, sold, and distributed 4 models of defective leads, including the Sprint Fidelis 6949 LFJ extendable/retractable screw fixation (S) model; the 6948 LFH tuned fixation (T) model; the 6931 LFT S fixation; and the 6930 LFK fixation (T) model.  All of the aforementioned models contain the same defect.

56.    The Sprint Fidelis leads were originally approved for sale by the FDA in September 2004.

57.    The Sprint Fidelis leads are uniformly defective in that they are prone to fracture of the pace-sense conductor and coil and the HV conductor, causing them to fail to function in a manner which may not be immediately detectable by the patient.  The malfunctioning can lead to terrifying inappropriate defibrillation shocks, failure to deliver appropriate (life-giving) defibrillation therapy and death.

58.    There is no test that predicts whether the Sprint Fidelis leads will fail.

59.    To this day, Medtronic has refused to suggest replacement of the defective Sprint Fidelis leads in its patients, even though in patients whom these defects have been discovered, emergency replacement of the leads is required.

60.    Medtronic's failure to document or follow up on the known defects in its Sprint Fidelis leads, and concealment of known defects from the FDA, Plaintiff, and the medical community constitutes fraudulent concealment that equitably tolls applicable statutes of limitation.

61.    Plaintiff could not have discovered the existence of the defect in the Sprint Fidelis leads until, at least, March 2007, when the first physician advisory was sent by Medtronic to physicians concerning the fragile nature of these leads.

62.    Medtronic is estopped from relying on the statute of limitations defense because Medtronic actively concealed the lead defects, suppressing reports, failing to follow through on FDA notification requirements, and failing to disclose known defects to physicians.  Instead of revealing the defects, Medtronic continued to represent its products as safe for their intended use.

14

63.     Medtronic's conduct, as described in the preceding paragraphs, amounts to conduct purposely committed, which Medtronic must have realized was dangerous, heedless and reckless, without regard to the consequences or the rights and safety of Plaintiff.

64.     Thousands of patients' lives rely upon the proper functioning of these Sprint Fidelis leads, and they — along with their physicians — have been vigorously attempting to assess the risks that they now face.

65.     Patients and physicians remain uninformed and confused about whether the devices should be explanted, or even whether all of the defects have been disclosed.

66.     Because of incomplete, inconsistent, and/or confusing information published by Medtronic, it remains unclear how many patients are affected by these defective leads, although based on the population of Medtronic patients whose claims are asserted in this complaints, it is likely to be at least 1,500 and could be as high as 6,000 heart patients in the United States.

67.     At all times herein mentioned, each of the Defendants was the agent, servant, partner, aider and abettor, co-conspirator and/or joint venturer of each of the other Defendants herein and was at all times operating and acting within the purpose and scope of said agency, service, employment, partnership, conspiracy and/or joint venture and rendered substantial assistance and encouragement to the other Defendants, knowing that their collective conduct constituted a breach of duty owed to the Plaintiff.

68.     There exists and, at all times herein mentioned, there existed a unity of interest in ownership between certain Defendants and other certain Defendants such that any individuality and separateness between the certain Defendants has ceased and these Defendants are the alter ego of the other certain Defendants and exerted control over those Defendants. Adherence to the

15

fiction of the separate existence of these certain Defendants as entities distinct from other certain Defendants will permit an abuse of the corporate privilege and would sanction a fraud and/or would promote injustice.

69.    At all times herein mentioned, Defendants, and each of them, were engaged in the business of, or were successors in interest to, entities engaged in the business of researching, designing, formulating, compounding, testing, manufacturing, producing, processing, assembling, inspecting, distributing, marketing, labeling, promoting, packaging, prescribing and/or advertising for sale, and selling products for use by the Plaintiff. As such, each Defendant is individually, as well as jointly and severally, liable to the Plaintiff for her damages.

70.    At all times herein mentioned, the officers and/or directors of the Defendants named herein participated in, authorized and/or directed the production and promotion of the aforementioned products when they knew, or with the exercise of reasonable care and diligence should have known, of the hazards and dangerous propensities of said products, and thereby actively participated in the tortious conduct that resulted in the injuries suffered by the Plaintiff.

## CLAIMS FOR RELIEF

### COUNT I

### Strict Liability

71.    Plaintiffs reallege and incorporate herein the allegations contained in the foregoing paragraphs.

72.    At all relevant times hereto, Medtronic was engaged in the business of designing, manufacturing, assembling, promoting, advertising, selling, and distributing the Sprint Fidelis leads for ultimate sale to, and implantation in, heart disease/disorder patients. Medtronic

16

designed, manufactured, assembled, and sold the Sprint Fidelis leads to hospitals and physicians, knowing that they would be thereby sold to patients with heart diseases and disorders, including Plaintiff.

73.    Medtronic's Sprint Fidelis leads were expected to and did reach Plaintiff without substantial change in their condition as manufactured and sold by Medtronic. In light of the defects described herein, at the time the leads reached Plaintiff, they were in a condition not contemplated by any reasonable person among the expected users of the devices, and were unreasonably dangerous to the expected users of the devices when used in reasonably expectable ways of handling or consumption.

74.    The Sprint Fidelis leads designed, manufactured, assembled, and sold by Medtronic to Plaintiff were in a defective condition unreasonably dangerous to any user or consumer of the devices, and Plaintiff was, and is, in the class of persons that Medtronic should reasonably have foreseen as being subject to the harm caused by the devices' defective condition.

75.    Plaintiff used the leads in the manner in which the leads were intended to be used. This has resulted in injuries to Plaintiff.

76.    Plaintiff was not aware of, and could not in the exercise of reasonable care had discovered, the defective nature of Medtronic's Sprint Fidelis leads, nor could he had known that Medtronic designed, manufactured or assembled the leads in a manner that would increase the risk of bodily injury to him.

77.    As a direct and proximate cause of Medtronic's design, manufacture, assembly, marketing and sales of the Sprint Fidelis leads, Plaintiff has sustained and will continue to

sustain severe physical injuries and/or death, severe emotional distress, and economic losses and consequential damages, and are therefore entitled to compensatory relief according to proof, and entitled to a declaratory judgment that Medtronic is liable to them far breach of its duty to Plaintiff and Medtronic's failure to provide a safe and effective medical device; and Plaintiff is entitled to equitable relief as described below.

78.     Medtronic's Sprint Fidelis leads constitute a product dangerous for its reasonably intended use, due to defective design, manufacture, assembly, and marketing.  Medtronic is therefore liable to Plaintiff in an amount according to proof.

WHEREFORE, Plaintiffs pray for judgment against Defendants in the amount of Ten Million Dollars ($10,000,000.00) compensatory damages, and punitive damages, plus pre-judgment and post-judgment interest, attorneys' fees and costs.

## COUNT II

### Negligence

79.     Plaintiffs reallege and incorporate herein the allegations contained in the foregoing paragraphs.

80.     At all times relevant to this action, Medtronic had a duty to exercise reasonable care, and to comply with the existing standard of care, in its design, research, development, manufacture, inspection, labeling, marketing, promotion and sale of the subject Sprint Fidelis leads.

81.     Medtronic breached its duty of reasonable care and deviated from acceptable standards of care by manufacturing and assembling the Sprint Fidelis leads in such a manner that they were prone to fracture and fail to operate and malfunction and expose Plaintiffs to life-

18

threatening physical trauma, and by incorporating a defect into the design of the Sprint Fidelis leads.

82.    Medtronic breached its duty of reasonable care and deviated from acceptable standards of care by failing to notify the FDA at the earliest possible date of known design defects in the leads.

83.    Medtronic breached its duty of reasonable care and deviated from acceptable standards of care by failing to warn the Plaintiff about the risks, dangers and adverse effects that were known or knowable to Medtronic.

84.    As a direct and proximate cause of the Defendants' failure to comply with the required standards of care, Plaintiff has sustained and will continue to sustain severe physical injuries, severe emotional distress, economic losses and other damages, are entitled to compensatory damages and equitable and declaratory relief according to proof.  Medtronic's egregious misconduct alleged above also warrants the imposition of punitive damages against Medtronic.

WHEREFORE, Plaintiffs pray for judgment against Defendants in the amount of Ten Million Dollars ($10,000,000.00) compensatory damages, and punitive damages, plus pre-judgment and post-judgment interest, attorneys' fees and costs.

## COUNT III

### Intentional Infliction of Emotional Distress

85.    Plaintiffs reallege and incorporate herein the allegations contained in the foregoing paragraphs.

86.    Medtronic engaged in extreme and outrageous conduct, knowingly and/or recklessly marketing defective leads, knowingly and/or recklessly concealing a known and potentially fatal defect from Plaintiffs, and knowingly and/or recklessly misrepresenting the quality and usefulness of the Sprint Fidelis leads.

87.    As a direct result of Medtronic's misconduct, Plaintiffs have sustained and will continue to sustain physical injuries and/or death, economic losses, and other damages.

88.    Medtronic intended to cause Plaintiffs severe emotional distress, or acted with reckless disregard for the Plaintiffs' emotional states.

89.    Plaintiffs did, in fact, incur (and continue to incur) severe emotional distress as a result of Medtronic's misconduct. Accordingly, Plaintiffs are entitled to compensatory damages and equitable and declaratory relief according to proof.

90.    Medtronic's misconduct alleged above warrants the imposition of punitive damages against Medtronic.

WHEREFORE, Plaintiffs pray for judgment against Defendants in the amount of Ten Million Dollars ($10,000,000.00) compensatory damages, and punitive damages, plus pre-judgment and post-judgment interest, attorneys' fees and costs.

## COUNT IV

### Negligent Infliction of Emotional Distress

91.    Plaintiffs reallege and incorporate herein the allegations contained in the foregoing paragraphs.

92.    Medtronic carelessly and negligently manufactured, marketed and sold defective Sprint Fidelis leads to Plaintiffs, carelessly and negligently concealed these defects from

20

Plaintiffs, and carelessly and negligently misrepresented the quality, safety and usefulness of the leads.

93.     Plaintiffs were directly involved in and directly impacted by Medtronic's carelessness and negligence, in that Plaintiffs have sustained and will continue to sustain severe physical injuries and/or death, economic losses, and other damages as a direct result of the decision to purchase, use and have implanted in his body a defective and dangerous product manufactured, sold and distributed by Medtronic.

94.     Medtronic's misconduct as alleged above has caused Plaintiffs to suffer severe emotional trauma, physical consequences and long continued emotional disturbance. Plaintiffs are therefore entitled to compensatory damages and equitable and declaratory relief according to proof.

WHEREFORE, Plaintiffs pray for judgment against Defendants in the amount of Ten Million Dollars ($10,000,000.00) compensatory damages, punitive damages, plus pre-judgment and post-judgment interest, attorneys' fees and costs.

## COUNT V
## LOSS OF CONSORTIUM

95.     Plaintiffs reallege and incorporate herein the allegations contained in the foregoing paragraphs.

96.     Plaintiff Pamela Beach was at all times relevant hereto the spouse of Plaintiff Douglas Beach, and lived and cohabited with him.

21

97.    Mrs. Beach has necessarily paid and has become liable to pay for medical aid, treatment and for medications, and will necessarily incur further expenses of a similar nature in the future.

98.    Mrs. Beach has been caused, presently and in the future, to suffer the loss of her spouse's companionship, services, society, and the ability of Mr. Beach, has in those respects been impaired and depreciated, and the marital association between husband and wife has been altered and, accordingly, has been caused great mental anguish.

99.    Mrs. Beach is entitled to punitive damages because Medtronic's failure to warn was reckless and without regard for the public's safety and welfare. Medtronic misled both the medical community and the public at large, including Plaintiffs herein, by making false representations about the safety of their products. Medtronic downplayed, understated and disregarded its knowledge of the serious and permanent side effects associated with the implantation of their products, despite available information demonstrating their products were likely to cause serious and sometimes fatal side effects to its users.

WHEREFORE, Plaintiffs pray for judgment against Defendants in the amount of Ten Million Dollars ($10,000,000.00) compensatory damages and punitive damages, plus pre-judgment and post-judgment interest, attorneys' fees and costs.

22

## DEMAND FOR TRIAL BY JURY

Plaintiffs demand a trial by jury as to all claims so triable in this action.

Respectfully submitted,

JANET, JENNER & SUGGS, LLC

Robert K. Jenner (D.C. Bar # 399969)
Hal J. Kleinman
1829 Reisterstown Rd., Ste 320
Baltimore, Maryland 21208
(410) 653-3200
(410) 653-6903 fax

*Attorneys for Plaintiffs*

Co-Counsel:
POGUST, BRASLOW & MILLROOD, LLP
Tobias L. Millrood
Derek T. Braslow
8 Tower Bridge, Suite 1520
161 Washington Street
Conshohocken, Pennsylvania 19428
(610) 941-4204
(610) 941-4245 (fax)

# CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

| **I (a) PLAINTIFFS** | **DEFENDANTS** |
|---|---|
| Douglas Beach and Pamela Beach | Defendants Medtronic, Inc.; Medtronic Puerto Rico, Inc.; and Medtronic Puerto Rico Operations Co. |

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF __Stafford, VA__
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY) _____
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Robert K. Jenner (D.C. Bar # 399969)
JANET, JENNER & SUGGS, LLC
1829 Reisterstown Rd., Ste 320
Baltimore, Maryland 21208
(410) 653-3200

ATTORNEYS (IF KNOWN)

---

**II. BASIS OF JURISDICTION**
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government Plaintiff
○ 3 Federal Question (U.S. Government Not a Party)
○ 2 U.S. Government Defendant
⦿ 4 Diversity (Indicate Citizenship of Parties in item III)

**III CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ⦿ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ⦿ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

---

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

**○ A. Antitrust**

☐ 410 Antitrust

**○ B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☒ 365 Product Liability
☐ 368 Asbestos Product Liability

**○ C. Administrative Agency Review**

☐ 151 Medicare Act

Social Security:
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

Other Statutes
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

**○ D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

---

**○ E. General Civil (Other)          OR          ○ F. Pro Se General Civil**

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ○ **G.** *Habeas Corpus/ 2255* | ○ **H.** *Employment Discrimination* | ○ **I.** *FOIA/PRIVACY ACT* | ○ **J.** *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex,<br>national origin,<br>discrimination, disability<br>age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted<br>Student Loans<br>(excluding veterans) |

| ○ **K.** *Labor/ERISA (non-employment)* | ○ **L.** *Other Civil Rights (non-employment)* | ○ **M.** *Contract* | ○ **N.** *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting &<br>Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights<br>Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-<br>Employment<br>☐ 446 Americans w/Disabilities-<br>Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment &<br>Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of<br>Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting<br>(if Voting Rights Act) |

**V. ORIGIN**

⦿ 1 Original   ○ 2 Removed   ○ 3 Remanded from   ○ 4 Reinstated   ○ 5 Transferred from   ○ 6 Multi district   ○ 7 Appeal to
Proceeding     from State    Appellate Court    or Reopened    another district    Litigation    District Judge
            Court                     (specify)               from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

28 U.S.C. §1332(1)

| **VII. REQUESTED IN COMPLAINT** | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | **DEMAND $** 75,000 | Check YES only if demanded in complaint<br>**JURY DEMAND:** YES ☒ NO ☐ |
|---|---|---|---|

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   YES ☐   NO ☒   If yes, please complete related case form.

DATE _1-10-08_    SIGNATURE OF ATTORNEY OF RECORD _(signature)_

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

**I.**    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

**III.**   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed <u>only</u> if diversity of citizenship was selected as the Basis of Jurisdiction under Section **II.**

**IV.**   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the <u>primary</u> cause of action found in your complaint. You may select only <u>one</u> category. You <u>must</u> also select <u>one</u> corresponding nature of suit found under the category of case.

**VI.**   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

**VIII.**  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.